In the Matter of L. HARDING ROGERS, JR., an Attorney, Respondent.

First Department, July 2, 1929.

*Einar Chrystie*, of counsel, for the petitioner.

*L. Harding Rogers, Jr.*, respondent in person.

DOWLING, P. J. The respondent was admitted to the bar in the Supreme Court, Appellate Division, First Department, in November, 1901.

There are two charges against respondent contained in the petition and the supplemental petition herein.

The first charge is in substance that the respondent induced a groceryman named Dunn to cash three drafts aggregating sixty-five

dollars by falsely representing that they would be paid when presented for payment at the place designated in the drafts, that being the respondent's office, room 508, 280 Broadway, New York city, where there was a fund or an account available for that purpose. No part of the money thus obtained by the respondent has been repaid to Dunn. At the time of the transactions respondent was heavily in debt and there were unpaid judgments of record against him.

Respondent denies that he made any misrepresentations to Dunn in order to induce him to cash the drafts and asserts that Dunn was willing to advance him the money because he looked upon respondent as a prospective customer.

The evidence shows that in June and July, 1925, Harry Dunn and his wife, Rebecca Dunn, conducted a grocery store in Brooklyn, Dunn's wife assisting him in the conduct of the business. In the latter part of June, 1925, the respondent called at the store, presented his card setting forth that he was an attorney at law with an office at No. 280 Broadway, New York city, and stated that he had moved into the neighborhood and that he wanted to open a charge account and purchase his groceries at the Dunn store. It was then agreed that an account of this character be opened and that the respondent would pay his bills weekly. In accordance with this arrangement the respondent purchased groceries valued at about the sum of eighteen dollars during the following week. At the end of the week the respondent called at Dunn's store, stated that he was short of cash, presented a draft for the sum of thirty-five dollars and requested Dunn to give him the difference between the face of the draft and the amount of the unpaid grocery bill in cash. He then stated that he had an account with the other lawyers in his office upon which account they drew drafts and that such drafts would be paid out of this account when presented. The Dunns accepted the draft and gave the respondent the difference between the face thereof and the amount of the grocery bill in cash. The following is a copy of the draft:

" $35.00                                          July 1, 1925
Pay to the order of Cash.....................................
Thirty-five..............................................⁰⁰ Dollars
Value received and charge the same to account of
                          " L. HARDING ROGERS, Jr.
" To L. Harding Rogers, Jr., Room 508, No. 280 Broadway, New York City."

The Dunns further testified: Two days after the cashing of the first draft the respondent called again and induced Dunn to cash

another draft for fifteen dollars; and on July 6, 1925, the respondent called again and induced Dunn to cash a third draft for the sum of twenty dollars. All three drafts were similar in form and all were payable as aforesaid at room 508, 280 Broadway, New York city. The three drafts were deposited for collection and on July 8, 1925, they were all returned for the reason that payment had been refused when they were presented at the place designated therein.

No part of the money advanced has ever been repaid to the Dunns.

Ignatius A. Scannell, a member of the bar, who in July, 1925, had an office at room 508, 280 Broadway, New York city, testified that at about that time the superintendent of the building stated to him that the respondent, who had been employed in another office in the building after a disagreement with his employer, was looking for a temporary place where he could receive his mail and asked Mr. Scannell if he would accommodate him. Thereafter the respondent arranged with Scannell to receive his mail at Scannell's office and occasionally use a desk in the outside office. This was a temporary matter and it continued only for a period of about three weeks. Mr. Scannell also testified that no arrangement was ever made in any way authorizing the respondent to draw drafts to be paid out of any fund or account at the office and that there was never any fund or account available for such purpose.

The respondent, testifying in his own behalf, denied that he had said anything to the Dunns about an account at the office at 280 Broadway, New York city, available for the payment of the drafts drawn by him, and asserted that Dunn, knowing that he was financially embarrassed, was glad to help him because he expected that the respondent would become a customer.

On cross-examination the respondent admitted that at the time he obtained the $65 from Dunn he owed other creditors between $25,000 and $50,000, and that there were unpaid judgments of record against him.

The respondent admitted that his arrangement with Scannell provided that he was to receive his mail and telephone messages at Scannell's office and that papers could be served there. He also admitted that at the time he induced Dunn to cash the drafts he had not made any arrangement with Scannell or with any person in Scannell's office whereby drafts drawn by him would be paid if presented and that there was no fund or account in Scannell's office available for that purpose.

When the respondent was asked why he made the drafts payable at 280 Broadway, he replied: " Because that was the natural place

I would have it made out, for the simple reason that was where I went to get my mail, and that is where I would be, anyway. I could have made it out to — I could have made it out to Charles R. Carruth, 2 Rector Street, and he would probably help me out with it * * *."

The respondent admitted that when he induced Dunn to cash the second draft he had not made any provision for the payment of the first draft and that the situation was exactly the same on July 6, 1925, when he induced Dunn to cash the third draft.

The respondent's testimony regarding the cashing of the third draft is of interest as evidenced by the following extract from the record: " Q. And you knew on July 6th that in the regular course of business drafts drawn and deposited on July 1st and 2nd would be presented? A. Right; I knew that on Monday — Q. No, not later than the 5th, didn't you? A. Well, the 5th was Sunday, I think, and the 4th was, I don't know exactly what those dates were, but the 6th was either Sunday or Monday, I think it was Monday. Q. You knew then that on July 6th — A. I knew on July 6th, later on, I did, that I would have to take them up, this first draft up, or one of the two up, I knew from Saturday, the prior date, but up to 12 o'clock they had not come in, but they would be in on Monday, but I wasn't sure of that. Q. You had not made any provision to take them up when you went there on the morning of July 6th? A. No."

At a subsequent hearing before the official referee the respondent claimed that Dunn had consulted him with reference to a claim for damages against the city of New York for loss of merchandise in a flood and stated that he spent some time looking into the matter. He admitted that this claim was taken upon a contingent basis. He was unable to give definite information as to the services he had rendered in the matter and he has never made any claim against Dunn for a fee for the services claimed to have been rendered. Dunn was recalled as a witness after the respondent had given this testimony. He denied that he had ever engaged the respondent to act for him in the matter and stated that before the respondent's drafts had been returned unpaid he had retained Frederick S. Titsworth, another attorney, who had been recommended to him by his brother-in-law to look after his interests. Mr. Titsworth testified that he had been retained by Dunn on July 7, 1925. The drafts cashed by Dunn were returned unpaid on July 8, 1925.

There is no reason to doubt the veracity of the Dunns, both of whom were witnesses, nor of any other witness produced on behalf of the petitioner, and this charge is established by the evidence.

The second charge is in substance that the respondent, while acting as attorney for one Eldridge, the executor of the estates of Christina A. and Harry A. von Neidschutz, induced the executor to loan him various sums of money of the funds belonging to these estates aggregating $562.50, for which loans the respondent did not give any security and no part of the money thus obtained has been repaid.

At the time the respondent induced Eldridge to loan him the money belonging to the von Neidschutz estates respondent was heavily in debt and there were unpaid judgments of record against him.

The respondent denies that he induced the executor to loan him any part of the funds belonging to the von Neidschutz estates and asserts that the executor having learned of the respondent's financial difficulties voluntarily offered to loan the respondent an amount representing the commissions which he would ultimately receive for his services as executor.

In support of the charge, John P. Eldridge, the executor of the estates of Christina A. and Henry A. von Neidschutz, testified that he retained the firm of Kaye, McDavitt & Scholer, 149 Broadway, New York city, to take charge of the matter of the settlement of these estates and that when he called at their office these matters were placed in charge of the respondent who was then employed by that firm. Thereafter the respondent had charge of the matter of the settlement of these estates and he and Eldridge became very friendly. In the summer of 1926 the respondent told Eldridge that he was in financial difficulties and induced him to loan the respondent various sums of money belonging to the estates, in all aggregating $562.50. At this time respondent told him that he would not have to account as executor for a year and that in the meantime the money would be repaid. After this promise had been disregarded, Eldridge wrote to respondent demanding the money and received a reply dated February 3, 1927, in which, among other things, the respondent stated:

" The trouble here has been that you are of the opinion that your one head is better than any two heads, although I think we can both agree that this is a somewhat delicate matter.

" You do not have to file your report until fifteen days after one year has elapsed after the issuance of your letters.

" The Surrogate may compel you to file an accounting fifteen days after six months in the event that there has been an advertisement for creditors, but there was no advertisement in the Christina Estate.

" Now, my advice to you is not to communicate with the attorneys

of this estate in any event until you see me, but the thing to do now is to turn over to the beneficiary the money you have available in the Henry A. Estate. There is no reason why you should now turn over the moneys from the Christina Estate into the Henry A. Estate until after the year has elapsed and if you have a thousand dollars in the Henry A. Estate, you might send the attorneys for the beneficiary that amount and I will have an attorney in Brooklyn, who at my request will represent you, write them that upon the termination of one year you will then close up the Christina Estate and not until then.

" At the same time, it seems to me, that a check for a substantial sum from the Henry A. Estate ought to be turned over at this time.

" I have been so tied up that I have not been down to see you, but my telephone number, as you know, is Lindenhurst 51, and I would be glad to stop over some time at your convenience during the next few days at Jamaica, and discuss the matter with you at the Surrogate's Court, and if that will be most convenient to you it will probably be most convenient to me.

" I think I told you I would conclude the transfer tax proceeding, if you would furnish me with the details of the account of the moneys received in both estates, but while I have none of the figures here at Lindenhurst, you have failed to let me know of them.

" Before June of this year, I will be able to do whatever is necessary to properly have this matter concluded to your entire satisfaction, but until then, or about that time, it will be impossible for me to give very much cooperation, for reasons which I would be very glad to tell you at the time I see you."

No part of this money was repaid.

The respondent, testifying in his own behalf, admitted that he was acting as attorney for Eldridge at the time he borrowed the money and that Eldridge relied and acted upon his advice in the matter; that he knew that the money borrowed was taken from the funds belonging to the von Neidschutz estates; that when he borrowed the money he had not paid any part of his outstanding obligations amounting to from $25,000 to $50,000 which were due at the time of the Dunn transaction, above referred to; that he did not give Eldridge any security for the repayment of the money borrowed and that he had not repaid any part of it. The respondent asserted that at the time he borrowed the money he informed Eldridge regarding his financial difficulties and advised Eldridge that he could loan him out of the funds belonging to the estate an amount equal to the commissions he would be ultimately entitled

to for his services as executor which he thought amounted to $400. The respondent admitted that at the time be borrowed the money the executor had not accounted and that the court had made no adjudication as to the amount of the commissions due to the executor.

It appears that the respondent prepared schedules of the executor's accounts to be used in the transfer tax proceeding in which the commission claimed was stated to be $142.60. He claimed that this amount referred to the commission of the executor in the Henry von Neidschutz estate only and that as executor of the estate of Christina von Neidschutz, Eldridge would be entitled to an additional commission of $100, making a total commission of $242.60.

The respondent subsequently claimed that the executor was entitled to a commission based upon the gross value of real property belonging to the estate regardless of the decedent's equity therein. He testified as follows: " Q. In other words, if the estate owned a piece of property that was worth $100,000 was mortgaged for $95,000, he (the executor) would get a commission on the $100,000; is that right? A. That is true, and I will submit a brief on that point."

Such contention is without merit.

The Court of Appeals has held that commissions are not subject to an executor's disposal until ascertained and liquidated and upon grounds of public policy that they are unassignable.

There is practically no dispute regarding the facts as set forth in the supplemental petition. The respondent's sole defense is that he thought the executor was justified in loaning the estate funds on the theory that he would ultimately be entitled to commissions as executor. The executor had not been adjudged entitled to any commissions at the time of the transaction. According to the respondent's own figures the executor would never be entitled to commissions amounting to the sum advanced out of the funds of the estate.

The respondent knew that the funds advanced belonged to the estate. No security was given, no part of the money thus obtained has been repaid. At the time of the transaction the respondent was hopelessly in debt and had been in that condition for some time prior thereto.

Upon his cross-examination he was asked: " Q. Do you consider that you, as an attorney, are acting properly in advising a client to give you as a loan moneys belonging to an estate of which the client is executor, without security, before the executor has been judicially declared entitled to any commission? A. Well, do

I have to answer that, your Honor?   The Referee:   Yes.   Q. You can decline to answer, if you want to.   A. I would rather decline to answer that, because you can assume what I think, if you want to."

This second charge is also sustained by the evidence.

The learned official referee in his report said: " The respondent is not a mere tyro at the Bar.   He is a man of education, a graduate of one of the great universities of the country.   He has been a member of the Bar for twenty-six years.   His needs, apparently, subjected him to great pressure to raise from day to day the money to meet them.   He was clearly indifferent as to the means.   Neither his education nor legal experience prevented him from resorting to fraud and deceit to raise the money he needed from these trusting and unsuspicious people Dunn and Eldridge, although at that very time he was heavily in debt  with judgments recorded against him and outstanding obligations amounting to between $25,000 and $50,000.   On the contrary, such education and experience seem from the evidence to have been used solely to deceive them, and on the hearings before me to explain away, palliate or excuse such fraud and deceit.   He seems from this record to be entirely devoid of that high sense of honor and fair dealing which ought to characterize a man of his education and profession."

With these conclusions of the learned official referee we agree and believe that respondent is unfit to remain a member of the legal profession and should be disbarred.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent disbarred.